UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES JAY BAUM, and
ANTHONY PELLEGRINO,

    Plaintiffs,

vs.                                          Case No. 11-13318

JEFFREY WALSH, JASON             HON. AVERN COHN
SCHMITTLER, and DAVID
JACQUEMAIN,

    Defendants.
_____/

## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 18)

### I. Introduction

This is a civil rights case brought under 42 U.S.C. § 1983 with pendent state law claims. Plaintiffs James Baum (Baum) and Anthony Pellegrino (Pellegrino) are suing defendants Jeffery Walsh (Walsh), Jason Schmittler (Schmittler), and David Jacquemain (Jacquemain), all of whom are officers with the Shelby Township police department. Plaintiffs' claims arise out of an incident at Baum's home on September 1, 2009, located in Macomb Township, outside the jurisdiction of the Shelby Township police department. Plaintiffs claim unlawful detention and excessive use of force under § 1983. They also bring state law claims for false arrest, false imprisonment, and assault and battery. Specifically, the complaint makes the following claims:

    Count I        Excessive Force/Assault and Battery [state law]

    Count II       Violation of 42 U.S.C. § 1983 [excessive force]

Count III        Violation of 42 U.S.C. § 1983 [request attorney fees]

Count IV        False Arrest [state law]

Count V         False Imprisonment [state law]

Count VI        Violation of Plaintiff's Rights under the Fourth Amendment

Count VII       Violation of Plaintiff's Rights under the Eighth Amendment

Count VIII      Violation of Plaintiff's Rights under the Fourteenth Amendment

Before the court is defendants' motion for summary judgment. Defendants contend that plaintiffs' arrest was lawful and that they are entitled to qualified immunity. For the reasons that follow, the motion will be denied. As will be explained, the record is replete with material factual disputes regarding the relevant events making summary judgment inappropriate.[1]

## II. Background

The facts of the case as gleaned from the parties' papers are as follows:

### A. Initial Undisputed Facts

Walsh's wife, Beth Walsh, is also a Shelby Township police officer. The Walshs live in the same neighborhood in Macomb Township as Baum. Baum and the Walshs know one another.

On September 1, 2009, Antoinette Pellegrino (Antoinette), Baum's girlfriend, was driving a car when she was pulled over by a Shelby Township police officer and arrested on an outstanding warrant. All parties agree that Antoinette's arrest was

---

[1] Indeed, the Court is constrained to observe that viewing the facts in a light most favorable to plaintiffs, the defendants' actions in this case appear to have been clearly aggressive.

routine and without incident. A Shelby Township police officer permitted Antoinette to call Baum. After receiving Antoinette's call, Baum proceeded to the location where she had been pulled over, hoping to retrieve her car and avoid the $200 impound fee. It is at this point the parties' stories diverge.

### B. Baum Attempts to Retrieve Antoinette's Car

Both parties agree that, upon receiving the call from Antoinette, Baum proceeded to drive his car to the scene of Antoinette's arrest. Once he arrived on the scene, he spoke to the arresting officers. However, the parties disagree about the tenor of Baum's conversation with the officers at the scene of Antoinette's arrest.

#### 1. Plaintiffs' Version

According to Baum, he arrived at the scene of Antoinette's arrest and spoke to the arresting officers in an attempt to retrieve her car. The arresting officers refused to let Baum take the car home with him, but told him that he could go over to the Shelby Township police station and speak to a supervisor about it. Following this advice, Baum then drove over to the Shelby Township police station. Baum denies that he was confrontational or argumentative with the arresting officers at the scene.

#### 2. Defendants' Version

According to defendants, Baum was hostile and verbally confrontational with the arresting officers, and argued with them about Antoinette's arrest, as well as the car. When the police officers did not give Baum the answers he wanted, Baum proceeded to the Shelby Township police station to continue his efforts to take possession of the car.

### C. Baum Visits the Shelby Township Police Station

Both parties agree that, upon leaving the scene of Antoinette's arrest, Baum drove to the Shelby Township police station, and spoke with officers there. Once again, however, the parties disagree about the characterization of Baum's actions at the Shelby Township police station.

### 1. Plaintiffs' Version

At the station, Baum says the supervisor also refused to allow Baum to retrieve Antoinette's car. The supervisor also refused to speak to Baum about the details of the charges against Antoinette. Baum admits that he was upset over Antoinette's arrest, but maintains that he left the Shelby Township police station calmly and without incident.

### 2. Defendants' Version

Defendants maintain that Baum was threatening and volatile throughout this entire sequence of events. Baum was verbally hostile to the police station supervisor. In fact, defendants say that Baum was escorted from the Shelby Township police station after creating a disturbance.

### D. Baum Leaves the Station, Returns Home, and is Joined by Mike Pellegrino

Both parties agree that, after leaving the Shelby Township police station, Baum returned home. At home, he and Mike Pellegrino ("Mike") got into Baum's red Ford F250 pickup. They intended to drive to the Walsh home, located in close proximity to Baum's home, because they knew that both Walsh and Beth Walsh were Shelby Township police officers.

### E. Baum Arrives at the Walsh Home

Both parties agree that Baum and Mike arrived at the Walsh home in the red Ford F250 pickup. Walsh was not at home. Beth Walsh was at home, as were her three children. However, the parties radically differ as to their respective versions of the nature of the events at the Walsh home.

### 1. Plaintiffs' Version

According to plaintiffs, Mike stayed in the truck throughout the entire incident between Baum and Beth Walsh at the Walsh home. Baum left the truck and knocked on the door. He asked to speak to Walsh. Beth Walsh refused to answer the door, but spoke to Baum through the front window. Baum told Beth that Antoinette had been arrested, and asked if Beth Walsh could help. When it became apparent that Beth Walsh would not help him, he left. Once again, Baum maintains that he was calm and non-hostile. Baum denies threatening Beth Walsh, and asserts that "everything was calm" when he spoke to her. Moreover, Baum points out that Beth Walsh's written report on the incident makes no mention of any overt threats.

### 2. Defendants' Version

According to defendants, Baum threatened Beth Walsh multiple times, terrifying her. When Beth Walsh refused to let him into the home, Baum threatened her once again and said, "we'll see...." Beth Walsh was so frightened that she called her husband, Walsh, at work to report Baum's threatening behavior. Beth Walsh asked her husband whether there were any weapons in the house she could use to defend herself against Baum.

### F. Baum and Mike Leave the Walsh Home and Return Home

5

Both parties agree that, after failing to make contact with Walsh at his home, Baum and Mike left in the red Ford F250 pickup and returned to the Baum residence in Macomb Township. However, they dispute the manner in which Baum drove as he left the Walsh residence-whether or not he was driving erratically and "brake torque-ing."

### 1. Plaintiffs' Version

Baum admits that the tires on his truck squealed when he drove away from the Walsh home. However, he says that they did so because they are bald; Baum denies break torque-ing away from the home. After leaving the Walsh home, Baum and Mike drove to Baum's home.

### 2. Defendants' Version

According to defendants, Baum and Mike left the Walsh home at a great rate of speed, brake torque-ing down the street. This brake torque-ing left visible tire marks on the street.

### G. Defendants Decide to Head to Baum's Residence

Both parties agree that the three defendants were on duty as Shelby Township police officers on September 1, 2009. In addition, the parties agree that, after receiving Beth Walsh's phone call informing them of the incident at the Walsh home, the defendants left the Shelby Township police station and proceeded to the Walsh home. When they discovered that Baum had already left the Walsh home, the defendants decided to pursue Baum to Baum's home in Macomb Township-outside of their jurisdiction as Shelby Township police officers. However, the parties disagree on both the manner of and motive for defendants' decision to go to Baum's home. Defendants

claim that they were dispatched by superior officers in response to the threats against Beth Walsh.  Plaintiffs claim that defendants were never officially dispatched, and instead were after Baum personally for the perceived threats he made against Beth Walsh.  The parties' divergent events is further explained below.

### 1.  Plaintiffs' Version

Plaintiffs say that when Walsh received the first phone call from Beth Walsh, he became irate.  He decided to go after Baum, recruiting Schmittler and Jacquemain to assist him.  All three officers were in plainclothes and driving unmarked cars.  The three officers formed a convoy headed to Walsh's home to confront Baum.  During the drive over, one of the defendants stated to dispatch that they were headed to Walsh's home to "kick his [Baum's] ass."  Walsh, Schmittler, and Jacquemain were never instructed by a supervisor to go to the Walsh home, nor were they dispatched there via normal police procedures.

After Baum left the Walsh home, Beth Walsh called her husband a second time.  According to Walsh's deposition testimony, during this second phone call his wife told him that Baum had left the Walsh home, and that she was now OK.  At this point, despite learning that Baum had left and that Beth Walsh was OK, defendants decided to go after Baum anyway.  They headed to Baum's home with their lights and sirens running.  Not only did they travel outside their jurisdiction, the 911 call logs show that they did not inform Macomb Township dispatch where they were going.

### 2.  Defendants' Version

After being informed by Beth Walsh of Baum's threatening behavior, the defendants headed to the Walsh home to attempt to detain Baum and protect Beth

Walsh. Defendants took Baum's threats seriously, as they were aware of Baum's extensive and violent criminal record. Defendants appear to maintain that either the defendants were formally dispatched to the Walsh house or, at the very least, the station supervisor was aware of their destination and tacitly approved or their departure.

Upon arrival at the Walsh home, it became apparent to defendants that Baum had already left. Fearing that he would return, defendants proceeded to Baum's home to detain him and prevent any further threat to Beth Walsh. Defendants informed Macomb Township dispatch at their intent prior to arriving at the Baum home, and received their assistance throughout the remainder of events.

### H. Defendants Arrive at the Baum Home

Both parties agree that, at this point, Baum, Pellegrino, and Mike were at Baum's home. Baum's minor daughter, Taylor was inside the home. Baum and Mike spoke with Pellegrino and informed him of Antoinette's arrest. Baum, Mike, and Pellegrino decided to get back in the truck and drive away. It was at this point the defendants arrived at Baum's home in unmarked cars and in plainclothes.

The parties dispute the sequence of events relating to the defendants' arrival at Baum's home. Of note, the parties disagree about whether or not the defendants identified themselves as law enforcement officers upon arrival.

### 1. Plaintiffs' Version

According to plaintiffs, Baum, Pellegrino, and Mike were already in the red Ford F250 pickup when defendants arrived. The defendants arrived in unmarked vehicles driving across Baum's lawn. Defendants got out of the vehicles, pointed their guns at plaintiffs, and demanded that they get out of the truck and on the ground, screaming

profanities. Defendants never identified themselves as police officers. Because of this lack of identification, as well as the fact that defendants were wearing plainclothes and driving unmarked cars, plaintiffs had no idea that defendants were law enforcement officers. To the plaintiffs, the defendants appeared to be three men who "looked like they wanted to fight."

When defendants appeared and began shouting, Mike walked away from the truck. Baum and Pellegrino turned to confront defendants. Pellegrino shouted at the defendants, demanding to know who they were. Defendants did not answer him. Both Baum and Pellegrino began to slowly get on the ground.

### 2. Defendants' Version

According to defendants, Baum and Pellegrino were not in the red Ford F250 pickup when they arrived, but rather were attempting to get into the truck in order to return to the Walsh home. Defendants arrived at Baum's home to detain him and prevent him from returning to the Walsh home to carry out his threats against Beth Walsh. Upon arrival, defendants immediately identified themselves as police officers. They demanded that Baum and Pellegrino get on the ground. Baum began to do so, albeit slowly. However, Pellegrino immediately came at the defendants, looking to fight.

### I. Force Is Used Against Plaintiffs

Both parties agree that defendants used force against plaintiffs while handcuffing and restraining them. However, they disagree about the extend of the force used.

### 1. Plaintiffs' Version

According to plaintiffs, defendants used force despite that fact that both Baum

9

and Pellegrino were beginning to go to the ground of their own volition. Jacquemain forced Pellegrino face down on the driveway as well and bashed his head against the cement five to ten times. Jacquemain grabbed Pellegrino's scrotum and twisted it, telling Pellegrino that he was his "worst f***ing nightmare." One of the defendants stated that they were going to kill Pellegrino. Pellegrino struggled with Jacquemain and cursed at him.

At the same time as Jacquemain began to beat Pellegrino, Schmittler got on top of Baum where he had lain face down on his driveway. Schmittler laid on top of Baum, and Walsh struck his shoulder and forced him into handcuffs. The commotion on the driveway brought Baum's daughter Taylor out of the house. Taylor testified at deposition that she observed the defendants beating the plaintiffs and striking Pellegrino's head into the cement driveway. She stated that she screamed for them to stop, and was ordered back into the house by Walsh. A neighbor of Baum's became so concerned by the scene taking place on Baum's lawn that he or she called 911 to report that three people were at Baum's house "killing a guy on the grass."

### 2. Defendants' Version

Jacquemain used a take-down technique to subdue Pellegrino, while Schmittler and Walsh focused on Baum. Jacquemain took Pellegrino to the ground, but Pellegrino continued resisting. Jacquemain struggled to get Pellegrino into handcuffs. At the same time, Pellegrino was using obscenities towards the defendants and attempting to incite Baum to resist the defendants as well. Hearing Pellegrino, Baum began to struggle against Schmittler and Walsh's attempts to place handcuffs on him. Pellegrino shouted toward the house for someone to get a gun to use against the defendants.

10

Jacquemain eventually managed to cuff Pellegrino, while Walsh used a single, approved, shoulder-strike technique to cuff Baum.  Neither plaintiff was ever beaten.

After Pellegrino was cuffed and placed in the back of a police vehicle, he continued to be resistant and out-of-control.  He eventually kicked out the window of the police van in which he was placed.

### J.  Undisputed Facts Regarding the Arrival of the Macomb County Sheriff's Department and the Arrest of Baum and Pellegrino

Both parties agree that, at some point during the incident, Macomb County Sheriff's deputies arrived.  They took both plaintiffs into custody.  Macomb County Sheriff Hackel himself came to the scene and remained there for a period of time, speaking to officers on the scene.  Baum and Pellegrino were detained in a Macomb County police car while Sheriff Hackel was on the scene.

Baum was charged with disturbing the peace for his actions at the Walsh house. As a result, he lost his parole status and was reincarcerated.  Eventually, the charge was dropped.  After obtaining a court order, Baum was released from incarceration.

Pellegrino plead guilty to charges relating to his actions.

### K.  Key Documentary Evidence

Both parties have submitted various pieces of documentary evidence, as well as the depositions of various individuals.  In particular, plaintiffs have submitted several 911 call logs, while defendants have submitted two videotapes of the night's events.

#### 1.  The 911 Call Logs

The first 911 call log is to Shelby Township dispatch.  It records a male voice stating that, "I want to go straight to that Harbor Spring home and see if that red pickup

11

truck is there. I'm kicking his ass." The voice appears to be referring to Baum's red Ford F250. Plaintiff contends that the voice is Walsh's, although defendants deny this.

The second 911 call log is between Shelby Township and Macomb Township dispatch. In it, Macomb Township dispatch states that the Macomb County Sheriff wants to know why a Shelby Township police vehicle is traveling through Macomb Township with its lights and sirens on. The Shelby dispatcher says that the police vehicle was dealing with the threats against Beth, but that, "[H]e fled. . . I don't know why they're going 300 [code for traveling with their lights and sirens on] because they were all set for right now."

The final 911 call is from a neighbor of Baum's to Macomb Township dispatch. In the call, the neighbor reports that, at Baum's home, "[t]hese guys are, like, practically killing this guy in the grass." The caller was apparently unaware that defendants were police officers.

### 2. The Videotapes

The first videotape is from the dashboard camera of a police vehicle, presumable from a Macomb County Sheriff vehicle. It shows the car arriving at Baum's house after the three defendants are already there. Because the car from which the video was shot parks behind the defendants' SUVs, the video does not show any of the events clearly. However, in the distance it appears to show a struggle between three or four individuals.

The second video is of Pellegrino after he was placed in the back of the Macomb Township police van. It shows Pellegrino speaking to several officers, and it confirms that he did kick out the window of the police van. During the conversations with the

various law enforcement officials, Pellegrino states that his head was beaten against the cement, that he can feel his eyebrow split open and bleeding, and that he only fought the defendants because he didn't know that they were police. When questioned about when he realized defendant were police, Pellegrino gives several different answers in the video. At first he says he realized only after he was handcuffs. When pressed, he says that he realized when they put him on the ground. Throughout the video, a very strong white light is shining directly on Pellegrino's face, making it impossible to confirm whether or not he is, in fact, injured.

### III. Legal Standard

Summary judgment should be granted for the moving party where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). This burden does not require the moving party to produce affirmative evidence showing a lack of a genuine dispute of material fact; instead, the moving party can discharge its burden by "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the moving party has met its burden of demonstrating a lack of any genuine issue of material fact, the burden shifts to the non-moving party to "set forth specific facts showing a triable issue." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. See Sagan v. United States, 342 F.3d 493, 497 (6th Cir. 2003). However, metaphysical doubt about a material fact or "the mere existence of a scintilla of evidence" in support of the non-moving party is not enough." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Instead, the non-moving party must present sufficient probative evidence such that "a reasonable jury could return a verdict for the non-moving party." Hedrick, 255 F.3d at 451 (citing Anderson, 477 U.S. at 248).

## IV. Analysis

### A. 42 U.S.C. § 1983 Generally

Section 1983 on its own creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal laws. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "To successfully establish a claim under § 1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law." Ahlers v. Schebil, 188 F.3d 365 (6th Cir. 1999) (internal citations omitted).

### B. Qualified Immunity

Defendants have moved for summary judgment arguing that they are entitled to qualified immunity. Qualified immunity "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory

14

or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A right is clearly established if controlling authority from the United States Supreme Court or the relevant circuit, or a consensus of persuasive authority, would put a reasonable official on notice that his conduct violates a constitutional right. See Wilson v. Layne, 526 U.S. 603, 617 (1999).

Here, plaintiffs asserts that defendants violated their clearly established constitutional rights (1) to be free from arrest without probable cause, and (2) to be free from the excessive use of force. In response, defendants argue that the evidence clearly shows (1) that they had reasonable suspicion to detain plaintiffs, and (2) that all force used against plaintiffs was reasonable. The Court will address each argument in turn.

### C. The Arrest

As to this issue, defendants and plaintiffs disagree as to whether defendants' restraint of plaintiffs was a full custodial arrest, requiring probably cause, or merely a Terry detention, requiring only reasonable suspicion. It is not necessary to resolve this issue at this time because viewing the facts in the light most favorable to the plaintiffs, defendants lacked reasonable suspicion to detain plaintiffs, therefore failing even under Terry's more lenient standard.

To justify a Terry stop, an officer must have only a "reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity. . . However, to justify a Terry stop, an inchoate and unparticularized suspicion or 'hunch' is not sufficient. Instead, the officer must be able to articulate some minimal level of

objective justification for making the stop." United States v. Smith, 594 F.3d 530, 536-37 (6th Cir. 2010) (citations and internal quotation marks omitted). Here, construing the facts in the light most favorable to plaintiffs, defendants lacked any reasonable, articulable suspicion that Baum and Pellegrino had been, or were about to be, engaged in criminal activity.

Defendants argue that they had reasonable suspicion that plaintiffs had threatened Beth Walsh, and that they were about to return to the Walsh residence to carry out those threats. In so arguing, defendants rely on the "collective knowledge," or "police team" doctrine, which permits law enforcement officers to develop reasonable suspicion based on facts relayed to them by other officers, as well as by their own, personal observations. United States v. Hensley, 469 U.S. 221, 232-33 (1985); People v. Dixon, 222 N.W.2d 749, 751 (Mich. 1974) (abrogated on other grounds by People v. Hawkins, 668 N.W.2d 602 (Mich. 2003)). Defendants argue that, under the collective knowledge doctrine, they were entitled to rely on the Beth Walsh's reports of Baum's threats against her as in and of itself sufficient to establish reasonable suspicion to detain the plaintiffs.

Defendants' reliance on the collective knowledge doctrine is misplaced. The collective knowledge doctrine was developed in the context of assessing the reliability of information relied from one part of an investigative team to another during the course of an investigation. Hensley, 469 U.S. at 232-33. In other words, the collective knowledge doctrine protects officers who rely on information received from fellow police officers who are conveying that information in their capacity as law enforcement officials. The collective knowledge doctrine has been expanded to include reports of off-duty police

officers who witness criminal activity, United States v. Nafzger, 974 F.2d 906, 913 (7th Cir. 1992).

In their brief, defendants cite United States v. Swihart, 554 F.2d 264, 269 (6th Cir. 1977) as holding that the collective knowledge doctrine applies even to off-duty officers who are the victim-complainant of a crime. However, Swihart did not involve any report by a law enforcement official who was the victim of a crime. Id. Instead, the victim-complainant who was the source of the information in Swihart was a civilian firearms dealer. Id. at 267. As a result, it does not stand for the proposition that the collective knowledge doctrine extends to law enforcement officials making reports in the capacity of a victim-complainant. Here, Beth Walsh, the alleged victim of the crime, was not acting in her capacity as a police officer when she phoned her husband and relayed information to him. As such, defendants cannot avail themselves of the collective knowledge doctrine to establish reasonable suspicion to detain plaintiffs.

Taking the facts in the light most favorable to plaintiffs, defendants lacked reasonable suspicion to detain plaintiffs. Baum testified that he never threatened Beth, and that the entire encounter at her home was calm and uneventful. Moreover, Walsh testified that, before he proceeded to Baum's home, he received a call from Beth Walsh, telling him that Baum had left, and that everything was OK. Despite receiving this call, defendants went outside of their jurisdiction to detain Baum and Pellegrino at Baum's Macomb Township home.

If a trier of fact accepts plaintiffs' version of the facts, defendants had no reasonable suspicion to detain either Baum or Pellegrino. Baum maintains that he never threatened Beth Walsh. None of the defendants witnessed the incident, but

17

rather proceeded based on Walsh's phone calls with his wife. In addition, a jury which credited plaintiffs' version of the facts could conclude that, once Beth Walsh called Walsh to tell him that she was OK, the entire incident was over, depriving defendants of any further reason to pursue Baum. Moreover, Pellegrino was not even with Baum at the Walsh residence. Defendant Jacquemain himself testified that defendants had no information whatsoever related to any wrongdoing by Pellegrino prior to their arrival at Baum's home.

Thus, reading the record in the light most favorable to plaintiffs, reasonable minds could certainly differ on whether defendants lacked even reasonable suspicion to detain plaintiffs, let alone probable cause. Under plaintiffs' version, defendants traveled outside their jurisdiction to detain plaintiffs without any legitimate law enforcement reason. As such, plaintiffs have established a genuine issue of material fact as to whether defendants violated their clearly established constitutional right to be free from detention without reasonable suspicion and arrest without probable cause. As a result, defendants are not entitled to qualified immunity for detaining plaintiffs.

### D. Excessive Use of Force

Plaintiffs next allege that defendants violated their clearly established constitutional right to be free from the excessive use of force. Defendants say they are entitled to summary judgment because they did not use excessive force. Claims of the excessive use of force "in the course of an arrest should be analyzed under the Fourth Amendment and its 'objective reasonableness' standard. . . In applying the objective reasonableness test, the court is required to pay careful attention to the facts and circumstances of each particular case, including the [1] severity of the crime at issue, [2]

whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Bennett v. Krakowski, 671 F.3d 553, 561 (6th Cir. 2011) (citations and internal quotation marks omitted).

Defendants say that the uncontested material facts of this case establish that their use of force against the defendants was objectively reasonable, entitling them to qualified immunity. Plaintiffs, in contrast, maintain that a genuine issue of material fact exists as to the reasonableness of defendants' use of force.

Here, viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could conclude that defendants' use of force was objectively unreasonable. Both Baum and Pellegrino testified that they began to go to the ground when ordered to by the defendants, albeit slowly. Nonetheless, Baum, Pellegrino, and Baum's daughter Taylor all testified that Jacquemain slammed Pellegrino's head into the concrete five to eight times, kicked Pellegrino, and that Walsh struck Baum's shoulder. The incident was apparently sufficiently forceful for Baum's neighbor to call 911 to report someone being "killed" on the grass. Pellegrino complained about his head being struck against the concrete by Jacquemain in the video taken in the back of the police van immediately after the incident. This evidence is sufficient to create a genuine issue of material fact as to whether defendants' use of force was objectively reasonable. As a result, defendants are not entitled to qualified immunity based on the use of force.

### E. State Law Claims

Although defendants did not address plaintiffs' state law claims specifically, summary judgment is not appropriate on these claims. Because there is a genuine

issue of material fact as to whether defendants' had the authority to detain plaintiffs and whether the use of force was reasonable, plaintiffs' state law claims for assault and battery and false imprisonment continue.

### V.  Conclusion

For the reasons stated above, defendants' motion for summary judgment is DENIED.  Only a trial can resolve the divergent versions of the events displayed in the record.

SO ORDERED.

Dated:  December 7, 2012               S/Avern Cohn                              
                                       AVERN COHN
                                       UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 7, 2012, by electronic and/or ordinary mail.

                                       S/Sakne Chami                    
                                       Case Manager, (313) 234-5160